COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| RICARDO MARQUEZ, | § | No. 08-22-00177-CR |
| Appellant, | § | Appeal from the |
| v. | § | 409th Judicial District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC No. 20220D01247) |

## O P I N I O N

Challenging the legal sufficiency of the evidence supporting his conviction, contending the trial court erred in overruling a for-cause juror challenge, and challenging the legal and factual sufficiency of the negative finding on his sudden-passion claim, Appellant Ricardo Marquez (Marquez) appeals his conviction for the July 14, 2019 murder of Erika Gaytan (Gaytan). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual background

The jury trial in this matter spanned over ten days during the course of approximately a month in May and June 2022. Between the parties, more than 30 witnesses and 400 exhibits—including two recorded statements Marquez gave to law enforcement—were admitted. After

carefully reviewing the record, we provide the following as a summation of the evidence presented at trial.

### (1) Marquez and Gaytan's involvement

According to Marquez, a mutual friend introduced him to Gaytan after he saw her on Facebook, and the two had been casually dating for approximately a month. On July 12, 2019, they went out to a few bars together. One of Gaytan's friends who was at a bar with them that night testified that Marquez kept a close eye on Gaytan and "was just looking to see what [Gaytan] would look at." Marquez told police that he got into a fight with another man because the man was staring at Gaytan and told Marquez he was going to "twerk on her." Marquez and the other man were eventually separated, and the other man was kicked out of the bar. Gaytan's friend testified that after the fight, Gaytan held her hand for the rest of the night while at the bar; she stayed at the bar because she did not want to leave Gaytan alone; and Gaytan and Marquez left together that evening.

Marquez and Gaytan attended a concert together at the El Paso County Coliseum on the night of July 13, 2019. Most of what the jury heard about that night came from Marquez's recorded interviews with law enforcement. He stated that he picked Gaytan up in his Crown Victoria between 8:00 and 9:00 p.m. on July 13, and they arrived at the concert around 9:00 p.m. While at the concert, they got into what Marquez described as a "silly" argument about a comment he made about Gaytan's dress. They left the concert around 1:00 a.m. on July 14 with plans to go to a party at Gaytan's friend's house. However, according to Marquez, Gaytan changed her mind and wanted to go to a bar instead. When Marquez started driving toward the bar, Gaytan changed her mind again and wanted to go to her friend's house. So Marquez changed the direction he was driving

2

again. Marquez told law enforcement that he and Gaytan started to argue in the car because she kept changing their plans. Eventually he said "enough" and drove to his house.

Marquez said he had another argument with Gaytan on the drive to his house. He explained, "it had already been several times that I had insisted that, well, we be boyfriend and girlfriend or something[]" and he asked her why she had not yet given him a "yes." According to Marquez, Gaytan told him "[w]ell, it's that we're not anything[,]" and accused Marquez of talking to other women. Marquez said he continued to insist that she agree to be his girlfriend and told her he wanted something serious with her. Now at Marquez's house, Gaytan responded, "I no longer feel comfortable. I want to leave already." Marquez said he then followed Gaytan as she walked out of his house. He claimed that he offered to take her home, but she refused and said she was going to call a Lyft or go to an aunt's house close by. The following is Marquez's account of what happened next:

> "Look," I said to her, "Let me take you to your aunt's house." "No, no, no. I'm going to go by myself." At that point she leaves the house and I told her, "I will take you." "No. No. I already told you that I'm going to go by myself." . . . Then I told her, "You know what," I told her, "Come inside and call for it." I told her, "Call for it there inside if [] you are going to call for it." I tell her, "The neighbors are very gossipy." I told her, "They are going to call the police or something." . . . At that point she says, "No. No. No. You go inside. I'm going to wait for it here." . . . I told her, "Come inside." I told her, "You can ask for it here." I told her, "You see, you're clinging to . . . you not wanting me to take you. Call for it here." "No, I don't feel comfortable with you anymore." . . . I told her, "Do what you want." At that point I turn around and I go inside the house. . . . I had taken the dogs [] because they were barking because [] they don't know her, they start to bark. . . . So I let them out. When I got there, I closed the door. I put the dogs inside and I go to lie down . . . . I never checked if they got there for her. That was my mistake. I go to lie down and I got the urge to--well, I was still in party mode. And I said to myself, "I am going to call--I'm going to go to my brother's." So I drove []--to my brother's. And when I'm about to get there, I called him. Well, he didn't answer me so I said to myself, "No, well, nothing to do about it," and I came back. I came back to my house. I fell asleep.

### (2) Gaytan's disappearance

Erika Gaytan was described by witnesses as the loving and dedicated mother of a young son who would follow through on her plans with him; a family member and friend to many and someone who was responsive to their texts and calls; and someone with a robust and consistent social media presence. She had communicated on Facebook that she was excited about a new job and was going back to school. Her belongings, her son's belongings, and her dog were all at her apartment. Witnesses testified that it would be uncharacteristic of her to leave her life behind. Gaytan went radio-silent in the early morning of July 14, 2019, and was never heard from or seen again. At trial, Marquez proffered evidence he argues suggests she had motives to disappear, however, on appeal, Marquez concedes that the evidence presented at trial could have led a jury to conclude that Gaytan is dead.

### (3) Marquez's conduct after Gaytan's disappearance

#### (a) July 14, 2019

According to Marquez, he woke up around 11:00 or 11:30 a.m. on July 14, 2019, and sent Gaytan a text message. He did not question why Gaytan never responded to him because she had told him she was going to Juarez, and he assumed she either did not have signal or was still angry with him. He told law enforcement that he thought to himself, "Well, for her to be mad one day, well, I'm going to leave her alone, right? I'm also not going to be insisting." There is no evidence in Marquez's cell phone records that he ever tried to call Gaytan after July 13.

Law enforcement reviewed Marquez's phone messages and learned that at 10:55 a.m. the morning after the concert, Marquez sent a message to his brother, Roberto Marquez (Roberto), asking if he could borrow his Jeep. Roberto testified at trial that Marquez told him he needed to borrow his Jeep for about two hours because he was going on a date and the air conditioner in his

4

car was not working. Marquez told law enforcement after his arrest that he used the Jeep to go see someone at her house but could not remember where she lived, other than it was by Montana about five minutes from his house. Marquez refused to give law enforcement her name. Roberto stated that Marquez picked up the Jeep from his home around 11:00 a.m. To Roberto's knowledge, he had never met Gaytan and she had never been in his Jeep.

At 11:00 a.m.—five minutes after the message to his brother—Marquez sent a message to his brother-in-law asking if he could borrow his shovel. His brother-in-law responded that he was at work and told Marquez to call his sister. Marquez's call records show that he called his sister at 11:15 a.m. and spoke to her for 45 seconds. Marquez later said that he borrowed his sister's shovel that morning because he wanted to clean the front yard, but that he never cleaned the yard because "the occasion didn't present itself." Law enforcement found the shovel outside his house during a search on July 19, 2019, pursuant to a search warrant.[1]

After discovering that Marquez had borrowed Roberto's Jeep, law enforcement started pulling surveillance videos from the area around Marquez's and Roberto's residences to track the movement of Marquez's Crown Victoria and Roberto's Jeep from approximately 11:00 a.m. to approximately 3:00 p.m. on July 14. The first video shown at trial was from an elementary school between Marquez's residence and his sister's house. It shows Marquez's Crown Victoria being driven in the direction of his sister's house on July 14 and ten minutes later returning in the direction of Marquez's residence. A video from near Roberto's house shows the Jeep leaving Roberto's house shortly after 11:30 a.m. and being returned approximately two-and-a-half hours

---

[1] And in his Crown Victoria, they found a gas can, knives, and zip-ties in figure-eight shapes or handcuff shapes. Marquez explained that he used zip ties for work and made them into figure-eight shapes "just because." Marquez's co-worker testified that zip-ties were commonly used by electricians but were not common in the line of work he and Marquez did on a daily basis. He also testified that there is no reason for zip ties to be fashioned into handcuffs at a construction job site. The gas can did not have any fuel in it, but according to testimony from an investigating law enforcement officer, it smelled like gas inside.

later. And a video from a business between Roberto's home and Marquez's residence shows the Jeep being driven towards Marquez's residence shortly before noon on July 14. Videos from several businesses along Montana Avenue then establish that the Jeep was heading eastbound toward the Red Sands recreation area. The last surveillance camera catching the Jeep traveling eastbound toward Reds Sands on Montana Avenue was at Red Barn Trailers at 12:40 p.m. It is then seen returning from the direction of Reds Sands past Red Barn Trailers just before 1:40 p.m. An investigator testified to law enforcement's theory: that Marquez used Roberto's Jeep and his brother-in-law's shovel to transport Gaytan's body to the Red Sands area to dispose of it.

Roberto testified that Marquez returned to his house with the Jeep at approximately 2:23 p.m. Roberto, Marquez, and Roberto's two children then went to Red Sands to offroad in his Jeep. While at Red Sands, they opened the cargo area of the Jeep where he had his children's toys, backpacks, and an ice chest. Marquez sent a text message to his mother at 3:17 p.m. to let her know he moved her car out of the garage because he parked his inside.

### (b) Marquez's interaction with law enforcement

On July 19, 2019, an El Paso Police Department (EPPD) detective called Marquez, but he did not answer. Two detectives then went to his residence to attempt to speak with him in person. A Crown Victoria and a Dodge Caliber were parked in the driveway. No one answered the door. They attempted to call Marquez two more times, but he did not answer.

Two detectives watched the house for approximately ten hours without detecting any activity. At around 4:00 a.m., however, they saw lights turn on inside the house and a woman emerge from the house and leave in the Dodge Caliber. The woman was later identified as Maria Marquez (Maria), Marquez's mother. She drove "around and around" in circles before she was pulled over by the EPPD detectives about a block away from Marquez's home. When they

6

explained to Maria that they had a search warrant for her residence, she responded "I know what this is about." Maria then told the detectives Marquez was at the house and, after leading them back, opened the front door for them and called Marquez downstairs. Marquez then agreed to give a statement at the police department.

In his first statement to law enforcement after Gaytan's disappearance, Marquez stated that he had insisted to Gaytan several times that "we be boyfriend and girlfriend or something []." Gaytan, however, had rejected him. In his second statement, which took place approximately five months after his first statement and after he had been arrested for Gaytan's murder, Marquez told law enforcement that he did not remember exactly what happened the night of Gaytan's disappearance because he was drunk at the time. He did, however, tell law enforcement during his second interview that he was never interested in having a relationship with Gaytan, and "wouldn't have stayed in a serious relationship" with her because of her "past." He described Gaytan as not being "suitable for a serious relationship" and said he was only dating her to have some fun. Detective Gerardo Rodrigues testified that he found it unusual that Marquez spoke of Gaytan in the past-tense at times during the first interview.

### (4) Marquez's statements after Gaytan's disappearance

Marquez talked to several people (in addition to law enforcement) about Gaytan's disappearance. Some of them testified at trial. For example, Anabel Diaz—a mutual friend of Gaytan and Marquez—testified that she called Marquez the day after the concert to ask if he knew where Gaytan was. During the conversation, Diaz told Marquez "well, she doesn't show up and the last person she was with was you." Marquez responded, "[y]eah, I know and that's what worries me because the way you are accusing me people are going to think the same thing." He also told Diaz that he was "doubly worried," because "[f]irst, [] well, I care about [Gaytan] and

7

second, because, well, the last person she was with was me." According to Diaz, however, Marquez refused to speak with Gaytan's family and she did not "see [an] interest, a big interest on him trying to give information [of] where [Gaytan] was or what happened" and she felt "he was worried about himself."

Marquez's ex-girlfriend, Ana Quezada, also testified about a conversation she had with him at a bar approximately a month after Gaytan's disappearance. She testified that in response to her asking him if he had killed Gaytan, Marquez stated "[t]he police thinks I burned her. That is why they can't find her." When asked how she interpreted Marquez's response, Quezada testified, "[w]ell, I mean, he didn't say yes. He didn't say no. And in a certain way I thought that maybe he did do it. I don't know."

Daniel Serrano, Marquez's co-worker, also testified at trial about a statement Marquez made to him. Serrano stated that he gave Marquez a ride to work a few times, and on one occasion in response to Serrano's teasing, asking where Marquez left Gaytan, Marquez told him "they are never going to find her."

### (5) Evidence regarding cell phone locations

FBI Special Agent Sean Macmanus, who has specialized training in radio frequency, cell phones, cell phone networks, and the analysis of records relating to phone location, testified at trial regarding Marquez's and Gaytan's cell phone records and Google location history on July 13 and 14, 2019. He testified that Marquez called Gaytan at 8:34 p.m. on the evening of the concert from near his home. This phone call is the last recorded phone call activity for Gaytan's phone. At 8:58 p.m., Google records show Marquez was near Gaytan's residence. And by 9:07 p.m., the records show Marquez and Gaytan traveling together on Loop 375.[2] They arrived at the Coliseum by

---

[2] By "together" we mean that Google location detected Appellant's and Gaytan's phones as being in the same location.

8

9:25 p.m. Marquez and Gaytan departed from the Coliseum by 1:09 a.m. and traveled southeast and then northeast on Loop 375 until 1:19 a.m. At 1:25 a.m., Gaytan's Google records show she searched a Fitzpatrick Way address on Google maps, which was Hilda Moreno's address. Marquez and Gaytan then turned onto I-10 in the direction of Hilda Moreno's house, then changed course and headed southeast again. From 1:25 a.m. to 1:30 a.m., however, "very little movement" was reported, which caught the detectives' attention because Marquez and Gaytan were traveling on I-10 during this period.

The records then show that by 1:30 a.m., they were traveling toward Marquez's residence and arrived there about 1:40 a.m. From 1:41 a.m. to around 2:20 a.m., Gaytan's record activity shows over a dozen Google pins, all reflecting the vicinity of Marquez's residence. Then, after 2:19 a.m., Gaytan's Google activity stopped. According to Agent Macmanus, Gaytan's phone was turned off at this point and never turned back on. The last recorded location of Gaytan's phone, based on the Google records, was in the immediate vicinity of Marquez's home.

As for Marquez's phone, Agent Macmanus testified that from 1:26 a.m. to 3:10 a.m., there was one phone call and several Google activities recorded also reflecting the vicinity of Marquez's residence. Marquez had Google activities from 1:43 a.m. to 1:59 a.m., another one at 2:54 a.m., and others from 3:07 a.m. to 3:10 a.m. As for the phone call, it was an outgoing call made by Marquez at 3:08 a.m. to Roberto, which was made from the vicinity of Marquez's house. After 3:10 a.m., and for the four-and-a-half days thereafter, there are no Google location activity records for Marquez's device. When asked whether it is unusual for Google to stop collecting information for that length of time, Agent Macmanus responded that in his opinion Marquez adjusted his phone to remove location services:

> Yes. Typically, Google tries to consistently record your information.
> You will sometimes see gaps for short periods of time, but normally

9

when there is no--there is Google location and then no Google location, somebody's done something to their phone, either changed the settings, deleted an app or turned off the location history. Additionally, a user can go in and log in and delete their location history if they choose to.

### (6) Forensic evidence

Law enforcement searched Roberto's Jeep on July 30, 2019, over two weeks after Gaytan's disappearance. When law enforcement first identified the Jeep at Roberto's residence, but before they had a search warrant, the Jeep did not appear to have been washed. When they returned the same day with the search warrant, however, the Jeep had been cleaned. Roberto testified that he knew law enforcement would take custody of his Jeep because his brother was a person of interest on the news and had borrowed his Jeep "that day in question." He testified that he cleaned it despite this knowledge.

A trace amount of DNA belonging to Gaytan was detected on the left center area of the rear cargo compartment cover of the Jeep. The DNA profile, more specifically, was interpreted as a mixture of three individuals—Gaytan, Marquez, and Roberto's minor son. Approximately 53% of the DNA profile was attributed to Gaytan.

Marquez tried to discredit the DNA testing in this case by pointing out that the Texas Department of Public Safety Crime Lab in El Paso where the DNA analysis for this case took place had experienced several contamination events. Specifically, he questioned Texas DPS employee Cathey Serrano—who conducted the DNA analysis in this case—regarding the contamination events. Serrano testified that between September 2019 and May 2022, there were 20 contamination events at the lab. And she testified that she experienced ten contamination events in the 544 cases she was involved in during that time period. Serrano testified, however, that the contamination events were all unrelated to this case. Further, she stated that there are several methods for

detecting contamination, that she employed those methods in this case, and that there was no evidence of a contamination event.

Marquez also presented testimony from Dr. Michael J. Spence, an expert in biology and DNA forensics. Dr. Spence confirmed that trace DNA belonging to Gaytan was detected on the Jeep compartment cover and discussed the possibility of a secondary transfer. He claimed that her DNA could have been transferred to the Jeep "from a lot of mechanisms." He explained, for example, that it was possible that Marquez could have transferred Gaytan's DNA to the trunk of the Jeep as a result of not washing his hands after he was with Gaytan, or that he could have transferred Gaytan's DNA to the trunk of the Jeep as a result of sharing the liquor bottle with Gaytan—i.e., Gaytan's DNA being transferred onto Marquez's hands from the mouth of the liquor bottle they shared—or that her DNA could have come from a door handle. Dr. Spence also testified about the possibility that "the presence of [Gaytan's] DNA profile in the tested swab was a result of a lab contamination error" at any stage of collecting evidence. However, Dr. Spence explained that these were "hypothetical" possibilities because "[t]here is no way of diagnosing how DNA arrives on a given surface." He agreed that Gaytan's DNA could also have ended up in Roberto's Jeep by "criminal activity. . . . primary transfer or direct contact" between Gaytan and the Jeep.

**B. Procedural background**

On February 4, 2020, an El Paso County grand jury indicted Marquez with one count of murder and one count of tampering with evidence under cause number 20200D00301. It later re-indicted him under a new cause number 20220D01247 with one count of murder and one count of aggravated kidnapping. TEX. PENAL CODE. ANN. § 19.02(c), § 20.04(a)(5). The trial court granted a motion to carry over all filings and proceedings of the parties from the original indictment to the

second indictment. Consequently, all proceedings relevant to this appeal arise from cause number 20220D01247.

Marquez pled not guilty to both counts and proceeded to a jury trial that began on May 27, 2022. At the end of the State's case in chief, Marquez moved for a directed verdict on both counts. The trial court granted the directed verdict as to Count II (aggravated kidnapping) and denied it as to Count I (murder). The jury then found Marquez guilty of murder.

At the punishment phase of trial, and without proffering any additional evidence, other than his aunt's testimony that he was a good person, Marquez raised a sudden passion claim based solely on the State's theory of how Marquez killed Gaytan, i.e., that Marquez "snapped" in a fit of rage in response to Gaytan's final rejection of him. Following the presentation of evidence at the punishment phase,[3] the trial court rejected Marquez's sudden passion claim and found the habitualization enhancement paragraph not true. It then sentenced him to 75 years' confinement in the Texas Department of Criminal Justice Institutional Division. Marquez filed a motion for new trial, which denied by operation of law. This appeal followed.

## DISCUSSION

In three issues, Marquez challenges his murder conviction. In Issue One, Marquez maintains the evidence is legally insufficient to support his conviction. In Issue Two, Marquez asserts the trial court erred when it overruled his challenge for cause to a particular juror. In Issue Three, Marquez challenges the trial court's rejection of his sudden passion claim on legal and factual sufficiency grounds. We discuss each issue in turn.

---

[3] In his appeal briefing on the sudden passion claim, Marquez also mentions some of the State's punishment-phase evidence. Namely, the State called three witnesses "for no other reason than to establish that [he] was a jealous, angry person generally."

### A. Sufficiency of the evidence

#### (1) Standard of review

Under the Due Process Clause of the U.S. Constitution, the State is required to prove every element of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). In reviewing the sufficiency of the evidence where the State has the burden of proof beyond a reasonable doubt, we apply the legal sufficiency standard as articulated in *Jackson. Brooks v. State*, 323 S.W.3d 893, 894–95 (Tex. Crim. App. 2010); *Rogers v. State*, No. 08-22-00207-CR, 2023 WL 3736730, at *3 (Tex. App.—El Paso May 31, 2023, no pet.) (mem. op., not designated for publication). We must view all the evidence in the light most favorable to the verdict to determine whether any rational juror could have found the essential elements of the offense beyond a reasonable doubt. *Salinas v. State*, 163 S.W.3d 734, 737 (Tex. Crim. App. 2005). Because circumstantial evidence is as probative as direct evidence, guilt may be established by circumstantial evidence alone. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

"This standard gives full play to the responsibility of the factfinder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018) (quoting *Jackson*, 443 U.S. at 319). The trier of fact, therefore, is the sole judge of the weight and credibility of the evidence. As such, we may not reevaluate the weight and credibility of the evidence or substitute our judgment for that of the fact-finder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We must presume the fact-finder resolved any conflicting inferences in favor of the verdict, and we defer to those determinations. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014) (citing *Jackson*, 443 U.S. at 319). Our only task is to determine whether, based on the evidence

and reasonable inferences drawn therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Isassi*, 330 S.W.3d at 638.

"Direct and circumstantial evidence are treated equally: Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Further, "[e]ach fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction." *Nisbett*, 552 S.W.3d at 262. "Because evidence must be considered cumulatively, appellate courts are not permitted to use a divide and conquer strategy for evaluating the sufficiency of the evidence." *Id.*

### (2) Analysis

Marquez was charged with murder under TEX. PENAL CODE ANN. § 19.02(b). As charged in the indictment, the State was required to prove, beyond a reasonable doubt, the following elements: that Marquez either: (1)(a) intentionally or knowingly, (1)(b) caused the death of Gaytan by manner and means unknown; or (2)(a) with intent to cause serious bodily injury, (2)(b) committed an act clearly dangerous to human life that caused the death of Gaytan, by manner and means unknown. TEX. PENAL CODE. ANN. § 19.02(b). Marquez concedes on appeal that the evidence presented at trial could have led a jury to conclude that Gaytan is dead. However, relying on *Stobaugh v. State*, 421 S.W.3d 787 (Tex. App.—Ft. Worth 2014, pet. ref'd), Marquez argues that the State failed in its burden of proving him guilty because it did not establish that he "engaged in any particular conduct or committed any specific act directed at Gaytan that caused her death." And "because there is no evidence of a death-causing act, no facts exist in the record concerning

14

Marquez['s] conduct from which the jury could have reasonably inferred that he possessed the requisite mental state to support a conviction for murder." For the following reasons, we disagree.

**(a) The evidence strongly connects Marquez to Gaytan's death.**

In *Nisbett*, the Texas Court of Criminal Appeals addressed the appropriate analysis courts should utilize in considering murder cases "when the victim's body and the murder weapon are not found." 552 S.W.3d at 246. *Nisbett* is a consolidated appeal of two murder convictions. In the first case, *Nisbett v. State*, No. PD-0041-17, the court of appeals reversed the defendant's conviction because the State "did not establish what the fatal act was," or how the defendant caused the victim's death. *Nisbett v. State*, No. 03-14-00402-CR, 2016 WL 7335843, at *10 (Tex. App.—Austin Dec. 15, 2016, pet. granted) (mem. op., not designated for publication). Conversely, in the second case, *Delacruz v. State*, No. PD-0503-17, the court of appeals rejected the defendant's argument that the evidence was insufficient to convict him for murder because the State did not establish he had "committed a criminal act" that caused the victim's death. *Delacruz v. State*, No. 03-15-00302-CR, 2017 WL 1487391, at *25 (Tex. App.—Austin April 21, 2017, pet. granted) (mem. op., not designated for publication). In affirming the defendant's conviction, the court of appeals held that "the State was not required to prove *how* Delacruz caused [the victim's] death, only that he did." *Id.* at 26.

The Court of Criminal Appeals agreed with the court of appeals in *Delacruz*, holding that while "[e]vidence of how a victim died would likely be helpful in proving that the victim is dead (as well proving other elements of murder)," "it need not necessarily be known what caused the victim's death." *Nisbett*, 552 S.W.3d at 264. As a result, "[t]he cumulative force of all the incriminating circumstances can support a murder conviction even if the evidence did not prove

15

the method of commission of the offense." *Id.* (quoting *Ramos v. State*, 407 S.W.3d 265, 271 (Tex. Crim. App. 2013)).

*Nisbett* also reaffirmed the principle that "[i]t is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence . . . and circumstantial evidence can alone be sufficient to establish guilt." *Id.* at 262. Consequently, it held that while motive alone is not sufficient to establish guilt, "it is a significant circumstance indicating guilt." *Id.* at 265. And while opportunity, when coupled with motive, is also not sufficient to prove guilt, it "is indicative of guilt." *Id.* "Attempts to conceal incriminating evidence" is also probative of guilt. *Guevara*, 152 S.W.3d at 50. Other circumstantial evidence the Court of Criminal Appeals identified in assessing the sufficiency of the evidence in a murder conviction includes inconsistency in the defendant's story, physical evidence, and electronic evidence. *Nisbett*, 552 S.W.3d at 265.

Here, Marquez argues that the State did not offer evidence demonstrating *how* Gaytan was killed. But it was not required to; the circumstantial evidence the State presented strongly connected Marquez to Gaytan's death. For example, the evidence demonstrated that Marquez and Gaytan had a difficult relationship. There was testimony that two nights before Gaytan's death, Marquez watched her carefully at a bar to see everything she was doing and got into a fight with another man because he disrespected Marquez by wanting to dance suggestively with Gaytan. Marquez told law enforcement that the night of her disappearance the two had gotten into at least three arguments. The third one, according to Marquez, was due to Gaytan's multiple rejections of his insistence that the two be boyfriend and girlfriend. Marquez also admitted that he was the last person to see Gaytan alive, which is supported by the fact that the last location Gaytan's phone

16

can be detected was in the immediate vicinity of Marquez's home. There is evidence, therefore, that Marquez had both a motive and the opportunity to kill Gaytan.

Marquez also engaged in suspicious behavior immediately after Gaytan's disappearance. For instance, Marquez's phone records show significant location activity on the night of Gaytan's disappearance. His location activity, however, ends at 3:10 a.m. on July 14, two minutes after Marquez called his brother and less than an hour after the location services on Gaytan's phone ended (showing it last at Marquez's house or in the immediate vicinity). The State presented testimony from an expert in the analysis of Google location and cell phone records, who opined that for Marquez's location services to abruptly end, he would have had to have "done something to [his] phone, either changed the settings, deleted an app or turned off location history . . . [or] log in and delete [his] history location . . . ." Marquez argues on appeal that this evidence is not probative of his guilt because there was evidence that it was common for his phone to not share its location for days and even weeks at a time in the months before Gaytan's death. The jury, however, was free to decide how to consider this evidence. *Nisbett*, 552 S.W.3d at 262 ("This standard gives full play to the responsibility of the factfinder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."); *Dobbs*, 434 S.W.3d at 166 ("When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination.").

There was also significant evidence of Marquez's suspicious behavior on July 14. Just hours after Gaytan's disappearance, he texted Roberto asking if he could borrow his Jeep. And five minutes later, he texted his brother-in-law asking if he could borrow a shovel. Security camera footage then catches Marquez driving to his brother-in-law's house and then returning to his residence. Further, Roberto testified that Marquez took his Jeep around 11:00 a.m. that morning.

17

And security camera footage shows Roberto's Jeep leaving Roberto's home shortly after 11:30 a.m. and approaching Marquez's residence less than half an hour later. The Jeep is then seen driving towards the Red Sands desert area at 12:40 p.m. and returning approximately an hour later. Roberto testified that Marquez returned his Jeep to him at approximately 2:23 p.m.[4]

Gaytan's DNA, in a trace amount, was detected on the left center area of the rear cargo compartment cover of the Jeep approximately two weeks after the incident even though she had never met Roberto, had never been in his Jeep to Roberto's knowledge, and the Jeep had been washed between the time Gaytan disappeared and the over two weeks later when law enforcement searched it. Marquez attempts to discredit this evidence on the basis that nobody could testify to how Gaytan's DNA made it to Roberto's Jeep. He points to testimony from both his expert witness and the State's DNA analyst that the DNA could have reached the Jeep by indirect transfer. In other words, he claims that he could have carried Gaytan's DNA to Roberto's Jeep. But there was also testimony, including testimony from Marquez's own expert witness, that it was possible Gaytan's DNA ended up in the Jeep by "primary transfer or direct contact" between Gaytan and the Jeep. It was the jury's duty to resolve this conflict in the testimony. *Nisbett*, 552 S.W.3d at 262; *Dobbs*, 434 S.W.3d at 166. And reviewing the evidence in the light most favorable to the jury's verdict, as we must, it was not irrational for the jury to find that Gaytan's DNA ended up on Roberto's Jeep by primary transfer or direct contact.

Marquez's implausible and inconsistent statements are also circumstantial evidence of his guilt. For example, Roberto testified that Marquez told him that he needed to borrow his Jeep because he was going on a date and the air conditioner in his car did not work. Yet, he only made mention of visiting the woman at her home, he could not recall where exactly she lived, and he

---

[4] Roberto testified that he, his sons, and Marquez went back out to the Red Sands area the same afternoon in the Jeep after Marquez returned the Jeep to him.

refused to provide law enforcement with her name. Further, the record established that Marquez had access to his mother's car at the time. Marquez also told law enforcement that after Gaytan left his house on July 14, he drove to Roberto's house around 3:00 a.m. because he was still in "party mode," and he tried to call his brother when he was close to his brother's house. Yet, Marquez's cell phone records establish that Marquez tried to call Roberto from the vicinity of Marquez's own home. And according to Roberto, it was not common for Marquez to come to his house at this time of night to drink, since Roberto had kids.

Marquez told law enforcement in his first interview that he was insisting that Gaytan be his girlfriend and that he wanted something serious with her. In his second interview, however, he told law enforcement that he was never interested in having a relationship with Gaytan because she was not "suitable for a serious relationship." And Detective Rodrigues pointed out that Marquez used the past-tense at times when referring to Gaytan during their first interview.

Moreover, Marquez stated that Gaytan left his residence on July 14. The evidence presented at trial indicates that this is not true. The last place Gaytan was seen was Marquez's residence. And the last location of her phone before it was turned off or had its location services disabled was the vicinity of Marquez's home. Further, Marquez stated that Gaytan left his house to go to her nearby aunt's house in either a Lyft or on foot. Warrants were obtained for both Uber and Lyft records to confirm whether Gaytan ordered a ride the night she disappeared. Gaytan's Lyft records confirm she did not order a ride on July 14, 2019. She did not have an Uber account. And the last time her aunt saw her was on July 13, 2019.

Marquez argues on appeal throughout his brief that these individual pieces of evidence do not prove beyond a reasonable doubt that he killed Gaytan. For example, he argues that it was not reasonable for the jury to infer that Gaytan's body was transported in Roberto's Jeep just because

19

her DNA was detected on its rear cargo component. And he would be correct if this were the only piece of evidence tying him to Gaytan's death. Evidence, however, is not considered in a vacuum; it must be considered cumulatively. *Nisbett*, 552 S.W.3d at 262. Indeed, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence in a criminal appeal. *Id.* As a result, it is not necessary that each individual fact presented at trial independently point to the defendant's guilt "if the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.*

Marquez further argues that the evidence in his case is different from the stronger circumstantial evidence in *Nesbitt* and *Delacruz* and more akin to the evidence in *Stobaugh*, such that a rational juror could not find that Marquez caused Gaytan's death without speculating. However, in *Stobaugh*, unlike the case here, "[n]one of Charles's actions were probative of the *mens rea* element" nor were "Charles's lies and inconsistent statements[] on such topics or of such a nature that they are capable of supporting an inference of *mens rea* for murder." *Stobaugh*, 421 S.W.3d at 866–67. Moreover, DNA evidence and Google location and cell phone evidence were present in Marquez's case—two categories of evidence that were not present in *Stobaugh*. *Id.* Finally, as the State points out, *Nesbitt* and *Delacruz* do not set a threshold for the circumstantial evidence required to support that a murder occurred. We must examine the evidence in each case before us. Here, the cumulative force of the evidence strongly connects Marquez to Gaytan's death.

### (b) The evidence was sufficient to show Marquez's culpable mental state.

Marquez argues on appeal that because the State did not prove he engaged in any particular act that caused Gaytan's death, there could not be any facts in the record "from which the jury could have reasonably inferred that he possessed the requisite mental state to support a conviction." As already discussed, however, the State was not required to prove *how* Marquez killed Gaytan,

just that he did. *Nisbett*, 552 S.W.3d at 264. And while evidence of how Gaytan died would likely be helpful in proving Marquez's mental state at the time of her death, it is not essential. *Id.* Indeed, "[b]y its nature, a culpable mental state must generally be inferred from the circumstances." *Id.* at 267.

Marquez relies heavily on the Fort Worth Court of Appeals' opinion in *Stobaugh*, a case involving a wife who went missing and was never found, nor was a murder weapon recovered. 421 S.W.3d at 787. There, the court reversed a murder conviction, finding that it was only through theorizing or guessing that the jury could conclude from the husband's lies, inconsistent statements, and post-disappearance actions that he possessed the *mens rea* necessary for the offense of murder. *Id* at 866–67. Marquez argues that his case is analogous to *Stobaugh* in that the State failed to present evidence sufficient to prove that he possessed the requisite *mens rea* to prove he committed murder. The jury, according to Marquez, must have engaged in speculation as it did in *Stobaugh*.

The *Stobaugh* court, however, found there was no evidence of *mens rea* in that case on the basis that "no facts exist in the record concerning [the defendant]'s conduct—any act by [the defendant] directed towards [the victim]—from which the jury could have logically inferred that [the defendant] possessed the requisite *mens rea* to support a conviction for murder." *Id.* at 864. The Court of Criminal Appeals disavowed this theory in *Nisbett* when it held that there was sufficient evidence in the record regarding the defendant's *mens rea* even though there was no evidence in the record establishing how the defendant killed the victim. 552 S.W.3d at 267 ("We also do not know how Julie died, but her pending divorce from Delacruz supplied him with a motive to kill her, and Delacruz's numerous online derogatory statements about her also indicated a motive to kill her."). Indeed, the *Nisbett* court reversed the court of appeals' decision in *Nisbett*

*v. State*, 2016 WL 7335843, at *14, which relied on *Stobaugh* to overturn the defendant's murder conviction on the basis that there was insufficient evidence in the record regarding the requisite *mens rea*. *See Nisbett*, 552 S.W.3d at 246 *overruling Nisbett*, 2016 WL 7335843, at *14 (holding that "[e]vidence and facts from which to infer appellant's mental state do not exist in the record[;] . . . the State failed to present evidence of precisely what fatal act appellant committed. Without evidence of how appellant caused Vicki's death, his mental state cannot be gleaned from the act or conduct itself or any associated words."). *Stobaugh*, therefore, is no longer reliable in this regard.

Marquez also picks apart the evidence and would have us determine—piece by piece—that the evidence in a vacuum cannot allow a rational juror to conclude beyond a reasonable doubt that Marquez possessed the *mens rea* to commit murder. Again, we do not view the evidence in a piecemeal fashion, seeing any one fact as "the lynchpin of [the State's] analysis" or looking for other "reasonable" explanations for each piece of evidence and attempt to substitute our own judgment for that of the jury; our charge is to determine whether the cumulative force of the circumstantial evidence, viewed in a light most favorable to the verdict, could allow a rational juror to infer beyond a reasonable doubt that Marquez acted with the requisite *mens rea*. *Salinas*, 163 S.W.3d at 737; *Nisbett*, 552 S.W.3d at 262. As "[w]e cannot read an accused's mind," without an admission, "we must infer his mental state from his acts, words, and conduct." *Nisbett*, 552 S.W.3d at 267 (quoting *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991)).

Viewing the evidence and reasonable inferences in the light most favorable to the verdict, as we must, we conclude that a rational juror could find beyond a reasonable doubt that Marquez either "intentionally or knowingly" killed Gaytan or "with intent to cause serious bodily injury"

22

committed an act clearly dangerous to human life that killed Gaytan.[5] TEX. PENAL CODE. ANN. § 19.02(b). There was evidence that Marquez was jealous and possessive of Gaytan. Specifically, there is evidence in the record that he had gotten into a physical fight with another man over dancing with her the night before she was killed. Gaytan's friend also testified about the manner in which Marquez kept his eyes on Gaytan at the nightclub and how Gaytan held her hand after the fight that night. And Gaytan had rebuffed Marquez's insistence that they be a couple on multiple occasions, including the night of her death. Marquez and Gaytan argued, by his account, at least three times that night.

There was also evidence from which a rational juror could infer that Marquez engaged in extensive efforts to cover up Gaytan's death, including simultaneously asking to borrow Roberto's Jeep and his brother-in-law's shovel just hours later, then driving Gaytan's body to the Red Sands desert area to dispose of her remains. The jury also heard evidence indicating that Marquez disabled the location services of his phone right after Gaytan's death.

Further, the explanation Marquez provided to law enforcement for why he borrowed the shovel and the Jeep that morning is implausible. Marquez gave inconsistent statements to law enforcement about his desire for a serious relationship with Gaytan. And despite his assertion that he was cooperative with law enforcement's investigation into Gaytan's disappearance, he made extensive efforts to avoid speaking with them in the initial days after her death. *See Myers v. State*, No. 09-02-00315-CR, 2003 WL 1837710, at *3 (Tex. App.—Beaumont April 9, 2003, pet. ref'd) (not designated for publication) (considering a defendant's attempt to hide from the police as a circumstantial piece of evidence indicating guilt). As a result, there was sufficient evidence to

---

[5] In our analysis, we do not take the following statements as inferential of an admission on Marquez's part: (1) Quezada's testimony that Marquez stated "The police thinks I burned her. That's why they cannot find her," and (2) Serrano's testimony that Marquez stated " . . . they will never find her."

allow a rational juror to infer that Marquez possessed the culpable mental state required for murder. *Nisbett*, 552 S.W.3d at 267–68 ("The culpable mental state for murder can be inferred from a defendant's motive, his attempts to conceal the body, and implausible explanations to the police.")

In sum, we conclude that the cumulative force of the circumstantial evidence, including reasonable inferences from that evidence viewed in the light most favorable to the verdict, was sufficient for a rational juror to conclude beyond a reasonable doubt that Marquez murdered Gaytan. Accordingly, we overrule Marquez's first issue.

## B. Prospective juror challenge for cause

In his second issue, Marquez argues that the trial court erred when it denied his challenge for cause to venireperson number 61 (VP61) for being physically unfit to sit on the jury. Specifically, Marquez argues that the trial court should have granted his challenge for cause in relation to VP61 because he had "a defect in his eyesight that he was incapable of properly evaluating the evidence." We disagree.

The parties agree that reversal is warranted on a denial of a challenge for cause of a perspective juror when the record demonstrates a *clear* abuse of discretion. *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010). This is true because the "trial judge is in the best position to evaluate a venire member's demeanor and responses." *Id.* "[W]e look at the entire record to determine if there is sufficient evidence to support the ruling." *Id.*

Texas Code of Criminal Procedure Article 35.16(a)(5) governs when a venireperson's physical fitness precludes her from serving on a jury. It states that a "challenge for cause may be made by either the state or the defense . . . [if] the juror has such defect in the organs of feeling or hearing, or such bodily or mental defect or disease as to render the juror unfit for jury service . . ." TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(5). Article 35.16(a)(5) describes specifically that a

venireperson may be disqualified to serve on a jury if she "is legally blind and the court in its discretion is not satisfied that the juror is fit for jury service in that particular case." TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(5). The term "legally blind" is specifically defined to mean "having not more than 20/200 of visual acuity in the better eye with correcting lenses, or visual acuity greater than 20/200 but with a limitation in the field of vision such that the widest diameter of the visual field subtends an angle no greater than 20 degrees." TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(11).

Marquez argues that VP61 was physically unfit to serve and his challenge for cause should have been granted because "he had such a defect in his eyesight that he was incapable of properly evaluating the evidence." As an initial point, nothing in the record establishes that VP61 was legally blind. He indicated during *voir dire* that sometimes the "eyelid flips when I sleep and stuff . . . so it makes my vision kind of blurry on this side." This, without more, does not meet Article 35.16's definition of legally blind. But even if the record did support a finding that VP61 was legally blind, Article 35.16 still gives the trial court discretion to overrule a challenge for cause if it is "satisfied that the [legally blind] juror is fit for jury service in that particular case." TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(5).

Here, VP61 indicated that he would have to sit in the front row of the juror box to see the facial expressions of a testifying witness. While the trial court did ask him to move forward from the jury box until he was comfortable with seeing the facial expressions of a testifying witness, the record does not show how far VP61 moved from the jury box, or if he moved at all. And based on its observation of VP61, the trial court agreed that VP61 did not have a visual impairment. Based on the entire record, we cannot find that the trial court clearly abused its discretion in making this determination. Accordingly, we overrule Marquez's second issue.

## C. Negative finding of sudden passion

In his third issue, Marquez argues that the evidence was legally and factually insufficient to support the trial court's negative finding that his murder of Gaytan was due to sudden passion under TEX. PENAL CODE ANN. § 19.02(d). While simultaneously denying he killed Gaytan, Marquez explains that "during the punishment phase of trial he was faced with a guilty verdict and had no choice but to argue sudden passion." In other words, he posits, "so long as the jury was permitted to find facts which supported an intentional killing, then it behooved Marquez to argue that those same facts supported a finding by a preponderance of that same evidence that the killing was done under the effects of sudden passion, especially when the State's own theory of the case was that Marquez snapped uncontrollably and by provocation." We find the evidence to be both legally and factually sufficient to support the trial court's negative finding.

### (1) Standard of review

As discussed, for elements of a criminal offense where the State bears the burden of proof beyond a reasonable doubt, we review sufficiency of the evidence under the *Jackson v. Virginia* standard. *Jackson*, 443 U.S. at 315–16; *Brooks*, 323 S.W.3d at 912. However, for matters in which the defendant bears the burden of proof by a preponderance of the evidence—such as the sudden-passion claim Marquez raised at punishment—we employ the civil standards of review for legal and factual sufficiency of the evidence. *See Rankin v. State*, 617 S.W.3d 169, 184–85 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd); *Gonzales v. State*, No. 11-17-00245-CR, 2019 WL 3727509, at *1–2 (Tex. App.—Eastland Aug. 8, 2019, pet. ref'd) (mem. op., not designated for publication); *see also Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013) (recognizing that a factual-sufficiency review applies to issues where the burden of proof is by a preponderance of the

26

evidence because that standard is the same used in various civil proceedings); *Rogers*, 2023 WL 3736730, at *3.

As applied to a sudden-passion claim, we review the evidence for legal sufficiency by examining the record for any evidence that supports the fact-finder's findings while ignoring all evidence to the contrary unless a fact-finder could not. *Matlock*, 392 S.W.3d at 669; *Rogers*, 2023 WL 3736730, at *3. If no evidence supports the finding, we review the entire record to determine whether the evidence establishes the opposite as a matter of law. *Matlock*, 392 S.W.3d at 668; *Rogers*, 2023 WL 3736730, at *3.

We review the evidence for factual sufficiency to support the finding by examining all of the evidence in a neutral light to determine whether the verdict is "so against the great weight and preponderance of that evidence to be manifestly unjust." *Matlock*, 392 S.W.3d at 672–73 (citation omitted); *Rogers*, 2023 WL 3736730, at *3; *see also Meraz v. State*, 785 S.W.2d 146, 154–55 (Tex. Crim. App. 1990) (en banc) (setting forth this standard). We may only sustain a factual-sufficiency challenge "if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience shocking, or clearly biased." *Matlock*, 392 S.W.3d at 671; *Rogers*, 2023 WL 3736730, at *3.

In reviewing both legal and factual sufficiency of the evidence, we must defer to the fact-finder's role as sole judge of the weight and credibility of the evidence and recognize that the fact-finder is free to accept or reject a defendant's version of the events supporting his sudden-passion claim. *See Rankin*, 617 S.W.3d at 185; *Rogers*, 2023 WL 3736730, at *3.

**(2) Applicable law**

Murder is normally a felony offense of the first degree. TEX. PENAL CODE ANN. § 19.02(c). However, § 19.02(d) of the Texas Penal Code allows a defendant to raise the issue of sudden passion in the punishment phase of a trial for murder to attempt to reduce the degree of the offense. In particular, § 19.02(d) provides:

> At the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree.

"Adequate cause" is defined to mean a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). "Sudden passion" means "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). The defendant has the burden of production and persuasion to prove sudden passion. *Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013).

**(3) Analysis**

**(a) The evidence is legally sufficient to support the trial court's negative finding.**

Marquez argues that the evidence presented by the State during the guilt/innocence phase of trial that he was jealous, became enraged when Gaytan rejected him, and just "snapped" provided evidence to support a finding that he killed Gaytan in sudden passion. Marquez's argument during the punishment phase mirrored the State's argument when he claimed that he "acted out of anger, rage, and resentment caused by [Gaytan]'s repeated flat-out rejection" of him. And that he "snapped" and "killed her as the State says because she rejected him over and over

28

and over again . . . ." As Marquez argues on appeal, "[t]he evidence in the record reflects that [he] had insisted and asked Gaytan several times that they be in a more serious relationship. That on the evening of July 13, 2019, she had been very affectionate with him, leading him to believe she was going to say yes. On the way to his house, Marquez insisted that Gaytan be his girlfriend and tells her to say yes. The conversation continued after the arrival at his house. Gaytan then told him she was not going to be his girlfriend." Marquez also mentions that even "[d]uring the punishment phase, the State paraded three witnesses through the witness box for no other reason than to establish that Appellant was a jealous, angry person generally."

The record does reflect that Marquez was both jealous and possessive of Gaytan. There is also evidence that Gaytan had rejected his multiple requests that the two be boyfriend and girlfriend, including a request that likely happened shortly before her death. However, we cannot find that Marquez's emotional response to Gaytan's rejection constitutes an "adequate cause" giving rise to sudden passion. The sudden passion claim is reserved for those circumstances in which the cause would "commonly produce a degree of anger, rage, or resentment . . . in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." TEX. PENAL CODE ANN. § 19.02(a)(1). The claim is not available in the case of someone "whose actual emotional responses are aberrational in this society." *Lopez v. State*, 716 S.W.2d 127, 129 (Tex. App.—El Paso 1986, pet. ref'd).[6] Indeed, this Court held almost 40 years ago that anger resulting from a rejection of a romantic proposal does not qualify as adequate cause for purposes of the sudden passion defense. *See Hill v. State*, 679 S.W.2d 173, 175 (Tex. App.—El Paso 1984, no pet.) ("The

---

[6] The Lopez court was operating under the prior voluntary manslaughter framework explained in footnote 7. *Lopez v. State*, 716 S.W.2d 127, 129 (Tex. App.—El Paso 1986, pet. ref'd).

jury could legitimately conclude that Appellant's entire depiction of the relationship was false, that he killed her as a spurned lover and that her rejection did not amount to adequate cause.").[7]

Today, we similarly find that the anger, rage, or resentment arising from the rejection of a romantic proposal, without more, does not constitute an adequate cause giving rise to sudden passion. In other words, we cannot conclude that Gaytan rejecting Marquez's repeated requests and insistence that he and she be boyfriend and girlfriend would "commonly produce a degree of anger, rage, or resentment . . . in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." To hold otherwise would impliedly normalize the inability to cool down and reflect following such a romantic rejection. Moreover, we agree with the State that, as opposed to Marquez's suggestion that Gaytan provoked him by rejecting him, "the trial court could have reasonably found that Marquez, who badgered Erika and refused to take 'no' for an answer, created the circumstances that allegedly inflamed his passions, such that he cannot claim that his conduct arose from adequate cause."[8]

---

[7] *Hill* was decided prior to September 1, 1994, when the "whether a defendant committed murder under the immediate influence of sudden passion arising from an adequate cause was an issue that was litigated at the guilt phase of the trial." *See Wooten v. State*, 400 S.W.3d 601, 604–05 (Tex. Crim. App. 2013) (explaining the history of the sudden passion affirmative defense). In *Wooten* the Court of Criminal Appeals explained the development of the sudden passion defense in 1994:

> If the evidence raised the issue of sudden passion, the question was submitted to the jury, and it had the option of finding the defendant guilty of the lesser offense of voluntary manslaughter. Because of certain anomalies generated by this framework, the Legislature acted in 1993 to remove the crime of voluntary manslaughter from the Texas Penal Code. Under the current statutory scheme, the question of whether a defendant killed while under the immediate influence of sudden passion is a punishment issue.

*Id.*(internal footnotes omitted) Importantly, however, the definition of what constitutes "adequate cause" for purposes of the sudden passion defense has not changed since *Hill* was decided. *See Hill v. State*, 679 S.W.2d 173, 174 (Tex. App.—El Paso 1984, no pet.) (citing *Hobson v. State*, 644 S.W.2d 473, 478 (Tex. Crim. App. 1983)) ("Viewing the alleged provocation objectively—through the eyes of an ordinary man—we do not find there is enough evidence of adequate cause, sufficient to render the mind of a person of ordinary temper incapable of cool reflection . . . .").

[8] In support of this point, the State cites *De Leon v. State*, 373 S.W.3d 644, 650 (Tex. App.—San Antonio 2012) and *Naasz v. State*, 974 S.W.2d 418, 425 (Tex. App.—Dallas 1998, pet. ref'd) (holding that the defendant could not claim his conduct arose from an adequate cause where he provoked the incident that allegedly inflamed his passions).

For these reasons, the trial court could have found that adequate cause giving rise to sudden passion did not exist. We conclude, therefore, that legally sufficient evidence supports the trial court's negative finding of sudden passion.

### (b) The evidence is factually sufficient to support the trial court's negative finding.

Regarding Marquez's factual sufficiency challenge, "we review all the evidence in a neutral light to determine if the contrary evidence greatly outweighs the evidence that supports the [trial court]'s determination." *Rogers*, 2023 WL 3736730, at *5 (citing *Gonzales*, 2019 WL 3727509 at *3). Marquez did not testify during either phase of the trial. Other than evidence of his jealousy and possessiveness toward Gaytan and her rejection of his romantic proposals, the record contains no other direct evidence of his state of mind when he killed Gaytan. On appeal, Marquez reiterates his punishment-phase position that, according to the State, he killed Gaytan when he snapped because of her multiple rejections of him, and he calls our attention to evidence indicating that he is not ordinarily given to rage.

Viewing all of the evidence in a neutral light, Marquez's assertion that his emotional response to Gaytan's rejection constituted adequate cause giving rise to sudden passion must fail for the same reasons enumerated above. The trial court was free to reject his assertion that, based on the facts, he was so emotionally overwhelmed by Gaytan's rejection of him that he was incapable of cool reflection, thus justifying the trial court's finding that Marquez's actions were not supported by adequate cause giving rise to sudden passion. Giving appropriate deference to the trial court's role as fact-finder during the punishment phase of trial, its negative sudden-passion finding is not so "against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *See Matlock*, 392 S.W.3d at 671; *Rogers*, 2023 WL 3736730, at *6.

31

Consequently, we conclude that factually sufficient evidence supports the trial court's negative finding of sudden passion.

Because we find legally and factually sufficient evidence supports the trial court's negative finding of sudden passion, we overrule Marquez's third issue.

## CONCLUSION

We affirm the judgment supporting Marquez's conviction.

LISA J. SOTO, Justice

February 29, 2024

Before Alley, C.J., Palafox and Soto, JJ.

(Publish)